**In re MID–AMERICAN WASTE SYSTEMS, INC., et al., Debtors.**

**Bankruptcy No. 97–104 PJW.**

United States Bankruptcy Court, D. Delaware.

Jan. 13, 1999.

Laurie Selber Silverstein, William A. Hazeltine, Potter Anderson & Corroon LLP, Neil B. Glassman, Scott D. Cousins, The Bayard Firm, Wilmington, DE, Alan W. Kornberg, Andrew N. Rosenberg, Paul,

Weiss, Rifkind, Wharton & Garrison, New York City, for Mid–American Waste Systems, Inc.

Ian Connor Bifferato, Bifferato, Bifferato & Gentilotti, Wilmington, DE, Anthony Di-Sarro, Christoph Heisenberg, Winston & Strawn, New York City, Daniel J. McGuire, Winston & Strawn, Chicago, IL, for NatWest Capital Markets Limited.

Jeffrey C. Wisler, Williams, Hershman & Wisler, P.A., Wilmington, DE, Evan R. Chesler, Robert H. Baron, Daniel Slifkin, Marcus A. Asner, Cravath, Swaine & Moore, New York City, for Donaldson, Lufkin & Jenrette Securities Corporation.

Anne Bookout, Smith Katzenstein & Furlow LLP, Wilmington, DE, Alan J. Lipkin, Jil Mazer–Marino, Willkie Farr & Gallagher, New York City, for Certain Officers & Directors.

## MEMORANDUM OPINION

PETER J. WALSH, Chief Judge.

Before the Court are the objections (Doc. # 760, 761, 795) of reorganized debtor Mid–American Waste Systems, Inc. ("MAWS") to (i) the proofs of claim filed by MAWS's former officers and directors John D. Peckskemp, R. Jay Roberts, Christopher L. White, Richard A. Nidders, Jr., and Dennis P. Wilburn (collectively the "O & D Claimants"), (ii) the proof of claim of NatWest Capital Markets Limited ("NatWest"), and (iii) the proof of claim of Donaldson, Lufkin, & Jenerette ("DLJ", and together with the O & D Claimants and Natwest, the "Claimants"). MAWS objects to the claims on the grounds that they should be subordinated pursuant to § 510(b) of the Bankruptcy Code,[1] or, alternatively, they should be disallowed and expunged pursuant to § 502(e)(1)(B). In addition, MAWS objects to the O & D Claimants' claims on the ground that their claims are not allowable as administrative expense claims under § 503(b)(1)(A). For the reasons given below, I find that the Claimants' claims should be treated as unsecured subordinated claims pursuant to § 510(b). Because subordinated claims under MAWS' liquidating plan are not entitled to any distribution, I need not reach the alternative issue of whether the claims should be disallowed pursuant to § 502(e)(1)(B).

## FACTS

MAWS was formed in December 1985 to acquire and operate solid waste collection operations and landfills. MAWS commenced operations in January 1986 and rapidly expanded through the acquisition of more than 127 collection operations, transfer stations, and preexisting collection services.

In May 1994, MAWS obtained a $75 million unsecured credit facility provided by three lenders. As contemplated by the facility, MAWS effected a public issuance of $175 million of 12.25% Senior Subordinated Notes due 2003 (the "Notes"). Pursuant to an underwriting agreement dated May 17, 1994, NatWest and DLJ served as underwriters for MAWS in connection with the offering of the Notes. Section 6 of the underwriting agreement contains an indemnification clause which provides that

(a) The Issuers [i.e., MAWS], jointly and severally, agree to indemnify and hold harmless [DLJ and NatWest] to the fullest extent lawful, from and against any and all losses, claims, damages, liabilities, judgments, actions and expenses (including without limitation and as incurred, reimbursement of all reasonable costs of investigating, preparing, pursuing or defending any claim or action ... commenced or threatened, including the reasonable fees and expenses of counsel to [DLJ and NatWest]) directly or indirectly caused by, related to, based upon, arising out of or in connection with any untrue statement or alleged untrue statement of a material fact contained in the Registration Statement ... or the Prospectus....

(b) [DLJ and NatWest] shall have the right to employ its own counsel in any such action and the fees and expenses of such counsel shall be paid, as incurred, by the Issuers (regardless of whether it is ultimately determined that [either DLJ or NatWest] is not entitled to Indemnification

---

1. All references to "§ ___" refer to a section of the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

hereunder). The Issuers shall not, in connection with any one such action or proceeding or separate but substantially similar or related actions or proceedings in the same jurisdiction arising out of the same general allegation or circumstances, be liable for the reasonable fees and expenses of more than one separate firm of attorneys ... at any time for [DLJ or NatWest].

In early 1996, following allegations of wrongful conduct by existing management, MAWS conducted a review of its operations and financial condition and discovered that its assets were impaired by approximately $186 million and that closure and postclosure costs had been underaccrued by $19 million. Such impairment and underaccruals were in addition to $196 million of impairments and losses and $70 million in underaccrued closure and postclosure expenses recorded during the 1995 fiscal year. Prior to its Chapter 11 filing, MAWS took write downs on their financial statements of over $470 million to account for overstatements of asset values and understatements of amortization costs and accrued closure and postclosure obligations.

During the period January 17, 1997 through April 16, 1997, certain holders of the Notes commenced the following actions against certain of the Claimants and others:

(i) *Federated Management et al. v. Coopers & Lybrand, LLP*, Court of Common Pleas, Franklin County, Ohio, Case No. 97CVH-01-2196, filed January 24, 1997 (the "Ohio Lawsuit");

(ii) *Canyon Capital Management, L.P. et al. v. Coopers & Lybrand, LLP et al.*, United States District Court for the Southern District of Ohio, Eastern Division, Case No. C2 97-419, filed April 14, 1997 ("Canyon I");

(iii) *Canyon Capital Management, L.P. et al. v. Coopers & Lybrand, LLP et al.*, Court of Common Pleas, Franklin County,

Ohio, Case No. 97CVH04-4481, filed April 16, 1997 ("Canyon II").

Each lawsuit named former officers and directors Christopher White, Dennis P. Wilburn, and Richard A. Widders as defendants. The Ohio Lawsuit was later amended to add former director Richard Jay Roberts as a defendant. The Ohio Lawsuit also named DLJ and NatWest as defendants.[2]

The plaintiffs allege causes of action for false representations and omissions in the registration statement, prospectus and financial statements filed with the SEC in connection with the sale of the Notes. The plaintiffs generally assert claims under Ohio securities laws, common law fraud, aiding and abetting common law fraud, negligent misrepresentation, breach of contract, breach of fiduciary duty/acting in concert, negligence and violations of sections 11, 12, 15 and 17 of the Securities Act of 1933. The Canyon I complaint also alleges causes of action pursuant to sections 10(b), 18 and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b-5. The plaintiffs seek rescission of the plaintiffs' purchases of the Notes, unliquidated actual damages and punitive damages. The Canyon I complaint also seeks disgorgement of profits. No judgment has been rendered in any of these lawsuits and they are still pending.

On April 22, 1997, certain equityholders commenced the following action against, *inter alia*, former officers and directors White, Wilburn and Widders:

*Bovee et al. v. Coopers & Lybrand, LLP et al.*, United States District Court for the Southern District of Ohio, Eastern Division, Case No. C2 97-449, filed April 22, 1997 (the "Equityholders Lawsuit", and together with the Ohio Lawsuit, the Canyon I Lawsuit, and the Canyon II Lawsuit, the "Securities Litigation").

The Equityholders Lawsuit is a class action complaint brought by purchasers of MAWS common stock during the period April 4, 1995

2. Several of the proofs of claim refer to *Corporate High Yield Fund, Inc. et al. v. Coopers & Lybrand, LLP et al.*, United States District Court for the District of New Jersey, Civil Action No. 97-325(AJL), filed January 17, 1997 (the "New Jersey Lawsuit"), which had named DLJ and Nat-

West as defendants. Pursuant to a stipulation of settlement, the New Jersey Lawsuit was dismissed with prejudice and without any payment by the O & D Claimants to the plaintiffs in the action.

through January 21, 1997. The complaint alleges that the defendants either knowingly or recklessly published or disseminated false financial statements and data causing the plaintiffs to buy MAWS stock at artificially high prices and suffer losses. The complaint asserts causes of action for violations of sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and SEC Rule 10b–5, as well as for negligence and negligent misrepresentation.

On January 21, 1997, MAWS and its thirty-one subsidiaries filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. On that date, MAWS filed a motion for approval of the sale of substantially all of their assets to USA Waste Services, Inc. That sale was subsequently approved, and thereafter the Court approved MAWS's Amended Joint Liquidating Plan of Reorganization (the "Plan"). The Plan provides for payment in full of class 1 administrative claims, partial payment for class 4 unsecured claims, and no payout to holders of class 7 subordinated claims. (Doc. # 541 at 18–25).

The O & D Claimants assert indemnification claims based on both MAWS's Certificate of Incorporation and on Delaware corporation law, 8 Del. C. § 145(c). The Certificate of Incorporation indemnification provision reads:

> The corporation will indemnify or agree to indemnify any person who was or is a party, or is threatened to be made a party to any threatened, pending, or completed action or suit by or in the right of the corporation to procure a judgment in its favor by reason of the fact that he is or was a director, officer, employee, or agent of the corporation, or is or was serving at the request of the corporation as director, trustee, officer, employee, or agent of another corporation (including a subsidiary of this corporation), domestic or foreign, nonprofit or for profit, partnership, joint venture, trust, or other enterprise against expenses, including attorneys' fees, actually and reasonably incurred by him in connection with the defense or settlement of such action or suit if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interest of the corporation, except that no indemnification shall be made in respect to any claim, issue, or matter as to which such person shall have been adjudged to be liable to the corporation unless, and only to the extent that, the Court of Chancery, or the court in which such action or suit was brought shall determine upon application that, despite the adjudication of liability, but in view of all the circumstances of the case, such person is fairly and reasonably entitled to indemnity for such expenses as the Court of Chancery or other such court shall deem proper.

(Doc. # 761 at 7)

The O & D Claimants were senior members of the MAWS management team. Several of the O & D Claimants were never employed postpetition, having resigned prior to MAWS's bankruptcy filing. All of the facts and circumstances which form the basis of the claims against the O & D Claimants in the Securities Litigation occurred prior to MAWS's bankruptcy filing. Each O & D Claimant lists his claim as an administrative expense claim.

NatWest and DLJ filed proofs of claim which seek, as general unsecured claims, (i) unliquidated damages pursuant to paragraph 6 of the underwriting agreement and section 11(f) of the Securities Act of 1933; and (ii) damages on account of fees, including attorneys' fees, and costs and expenses of defending the Securities Litigation that have already accrued (for NatWest, a liquidated amount of $455,283.22; for DLJ, a liquidated amount of $207,829.83) and that have not yet accrued.

MAWS objects to the Claimants' claims on the grounds that the claims should be subordinated pursuant to § 510(b) of the Bankruptcy Code, or, alternatively, that they should be disallowed and expunged pursuant to § 502(e)(1)(B). (Doc. # 760, 761, 795) In addition, MAWS objects to the O & D Claimants' claims on the ground that their claims are not allowable as administrative expense claims under § 503(b)(1)(A). The Claimants filed responses (Doc. # 802, 805, 837), MAWS filed replies thereto (Doc. # 860, 867, 868), and the Court heard oral argument on the matter.

## DISCUSSION

*The O & D Claimants' Claims as Administrative Expense Claims*

The O & D Claimants seek administrative expense priority for their indemnification claims against MAWS. They claim that, citing *Avellino & Bienes v. M. Frenville Co. (In re M. Frenville Co.)*, 744 F.2d 332 (3d Cir.1984), "a claim against a debtor for indemnification or contribution arising from litigation commenced against the creditor post-petition constitutes an administrative claim." (Doc. #802 at 6) Although the O & D Claimants seek an administrative expense priority payment, their brief does not discuss, or even identify § 503(b)—the governing statutory provision.

Section 503(b)(1)(A) defines administrative expenses as including "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case." It is well established that a company's duty to indemnify officers is a form of compensation. *Christian Life Center Litig. Defense Comm. v. Silva (In re Christian Life Center)*, 821 F.2d 1370, 1373 (9th Cir.1987) ("A corporation's duty to indemnify its officer, whether conferred by statute or by contract, is a form of compensation for the officer's services.") (citing *In re Baldwin–United Corp.*, 43 B.R. 443, 454–56 (S.D.Ohio 1984)); *see also In re Philadelphia Mortgage Trust*, 117 B.R. 820, 827 (Bankr.E.D.Pa. 1990); *In re Consolidated Oil & Gas, Inc.*, 110 B.R. 535, 537 (Bankr.D.Colo.1990); *In re Amfesco Indus., Inc.*, 81 B.R. 777, 784 (Bankr.E.D.N.Y.1988).

To establish administrative priority under § 503(b)(1)(A), the O & D Claimants must demonstrate that the claimed expenses (i) arose out of a postpetition transaction with the debtor-in-possession and (ii) directly and substantially benefitted the estate. *Microsoft Corp. v. DAK Indus., Inc. (In re DAK Indus., Inc.)*, 66 F.3d 1091, 1094 (9th Cir. 1995); *In re Molnar Bros.*, 200 B.R. 555, 559 & n. 3 (Bankr.D.N.J.1996). As the Second Circuit has stated:

[A]n expense is administrative only if it arises out of a transaction between the creditor and the bankrupt's trustee or debtor in possession and "only to the extent that the consideration supporting the claimant's right to payment was both supplied to and beneficial to the debtor-in-possession in the operation of the business." A debt is not entitled to priority simply because the right to payment arises after the debtor in possession has begun managing the estate.

*Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir. 1986) (quoting *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir.1976)) (citations omitted).

I do not perceive a postpetition transaction between MAWS and the O & D Claimants as having occurred here. The O & D Claimants were each employed prepetition by MAWS. The O & D Claimants' conduct which forms the basis for the Shareholder Litigation all arose out of their prepetition activities as officers and/or directors of MAWS. The indemnification provisions upon which the O & D Claimants base their claims were in place during the entire prepetition relevant period and covered the O & D Claimants throughout the prepetition period in which the conduct at issue occurred.

An indemnification claim by an officer or director based on that officer's or director's prepetition services is not a claim on account of "services rendered after the commencement of a case" that is entitled to administrative expense priority. Instead, the O & D Claimants' indemnification claims are merely claims for prepetition compensation for services rendered, not unlike salary or other benefits. *See, e.g., Christian Life*, 821 F.2d at 1373 (holding that officers' indemnity/contribution claims for litigation costs were not an administrative expense because litigation was based on prepetition services and conduct); *Baldwin–United*, 43 B.R. at 454–56 (holding that directors and officers' claims based on debtor's bylaws for indemnity of costs of defending against allegations of misconduct during their tenure on prepetition debtor's board of directors were not compensable as administrative claims); *Philadelphia Mortgage*, 117 B.R. at 828 ("[C]laims of corporate officers for indemnification and com-

pensation for pre-petition actions based upon corporate by-laws or resolutions ... have consistently been denied administrative status due to findings by courts that such claims are pre-petition claims because the acts or services which gave rise to them were performed pre-petition."); *Amfesco,* 81 B.R. at 781 ("All of the operative facts, legal relationships, and conduct of the Applicants upon which is based the threatened litigation occurred pre-petition.... Any duty of the Debtors to indemnify the Applicants arises from services provided to the pre-petition Corporation not for services rendered postpetition to the Debtors–in–Possession."); *Consolidated Oil,* 110 B.R. at 537 (holding that corporate officers and directors were not entitled to administrative expense priority on their right to indemnification for legal fees founded on state law, the debtor's articles of incorporation and bylaws, and employment contracts where the officers and directors performed no postpetition services for the debtor and the litigation, commenced postpetition, was based on prepetition conduct); *cf. In re Heck's Properties, Inc.,* 151 B.R. 739, 767 (S.D.W.Va.1992) (holding that debtor's officers and directors were entitled to administrative claim for indemnity or contribution for litigation costs pursuant to debtor's articles of incorporation because claim against officers and directors "related solely to postpetition conduct and services").

In their brief, the O & D Claimants state that each O & D Claimant timely filed a proof of claim stating that "the Claim is entitled to administrative priority status in accordance with *In re M. Frenville Co.*" (Doc. # 802 at 3–4) The O & D Claimants reliance on *Frenville* is misplaced. In *Frenville,* the Third Circuit held that an accounting firm's indemnification suit against the debtor, which arose as a result of a postpetition suit filed by defrauded security holders against the accountants but which implicated the accountants' prepetition conduct, constituted a postpetition claim because the accountants' "right to payment" arose only at the time the security holders' suit was filed. *Frenville,* 744 F.2d at 337. Thus, the court simply held that the automatic stay provisions of § 362(a), which require that a stayed proceeding "was or could have been com-

menced" before filing, did not apply to the accountants' suit for indemnification. *Id. Frenville* did not involve an administrative expense claim.

More importantly, the *Frenville* court distinguished the third-party action at issue in that case from the example of a prepetition contingent claim in surety relationships. *Id.* at 336–37. The court reasoned that "[w]hen parties agree in advance that one party will indemnify the other party in the event of a certain occurrence, there exists a right to payment, albeit contingent, upon the signing of the agreement." *Id.* at 336–37 (footnote omitted). In the case at bar, the O & D Claimants' indemnification rights are akin to a surety relationship created by MAWS's prepetition certificate of incorporation, under which the O & D Claimants are indemnified for certain prepetition conduct in the performance of their employment services. The only difference between the example given in *Frenville* and the certificate of incorporation at issue in the case at bar is the signing of an agreement. However, the corporation's commitment to indemnify, as provided in the certificate of incorporation, existed at the time each of the O & D Claimants' commenced employment, a fact of which the O & D Claimants were likely aware. The O & D Claimants now rely on its prepetition existence for their indemnification claims. In my view, the absence of a signed agreement is a technical nicety that makes no substantive difference between the prepetition surety agreement addressed in *Frenville* and the prepetition indemnity commitment in MAWS's certificate of incorporation.

The O & D Claimants argue that the certificate of incorporation is not a contract. To reach the conclusion that the certificate of incorporation created a contract on its effective date, the O & D Claimants argue, would produce the illogical result of granting the O & D Claimants a right to payment prior to their employment by MAWS.

In Delaware, a corporation's certificate of incorporation creates a contract between the state and the corporation. *See, e.g., Staar Surgical Co. v. Waggoner,* 588 A.2d 1130, 1136 (Del.1991). At a minimum,

the O & D Claimants are third-party beneficiaries of that contract and those benefits come into existence as to each officer and director when each of them become an officer or director of MAWS. The O & D Claimants could hardly deny their status as third party beneficiaries given that their claim of indemnification rights is founded in that contract. Their relationship to MAWS is akin to the surety relationship which the *Frenville* court stated created a surety right prepetition.

■ In addition to the indemnification clause of the certificate of incorporation, the O & D Claimants assert that they are entitled to indemnification based on § 145(c) of the Delaware General Corporations Law ("DGCL"), 8 *Del.C.* § 145(c), which states that

> [t]o the extent that a director, officer, employee, or agent of a corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in subsections (a) and (b) of this section [which include the claims asserted in the Shareholder Litigation], or in defense of any claim, issue or matter therein, such person shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by such person in connection therewith.

The mandatory indemnification requirement of § 145(c) of the DGCL only springs into existence when the officer or director has been "successful on the merits or otherwise in defense" of the action. The "or otherwise in defense" language contemplates a negotiated settlement in which the suit is dismissed with prejudice and without any payment or assumption of liability by the officer or director. *See Wisener v. Air Express Int'l Corp.*, 583 F.2d 579 (2d Cir.1978); *B & B Inv. Club v. Kleinert's, Inc.*, 472 F.Supp. 787 (E.D.Pa.1979).

■ The O & D Claimants identify only one such case involving them that has been dismissed with prejudice pursuant to a stipu-

lation of settlement under which the O & D Claimants made no payment to the plaintiffs. (Doc. # 802 at 4) However, MAWS asserts that all costs and fees incurred in connection with the Securities Litigation have been covered by MAWS's directors and officers insurance policy. (Doc. # 761 at 7–8) Because the O & D Claimants do not challenge this assertion, I conclude that the O & D Claimants have not yet incurred any actual or necessary expenses that would entitle them to indemnification under § 145(c) of the DGCL.

### The Claimants' Claims as Class 7 Subordinated Claims Pursuant to § 510(b)'s Subordination Provision

■ MAWS seeks to classify the Claimants' claims as Class 7 subordinated claims pursuant to § 510(b), which provides that

> [f]or the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.

MAWS argues that Claimants' claims are for "reimbursement" within the contemplation of § 510(b) and are therefore subordinated. NatWest and DLJ make two primary arguments against the application of § 510(b) to their claims: (i) the language of § 510(b) is ambiguous, and it does not encompass indemnification claims for liability and/or litigation expenses incurred by underwriters; and (ii) subordinating indemnification claims for litigation expenses of underwriters under § 510(b) is in conflict with the legislative purpose of § 510(b).[3] The O & D Claimants

---

**3.** NatWest and DLJ appear to take differing stances on what parts of their claim to which § 510(b) does not apply. NatWest argues that both its potential liability in the Securities Litigation, as well as its expenses incurred in that litigation, are not included within § 510(b)'s

scope, asserting that "[s]ection 510(b) was designed to subordinate the claims of owners of securities, not claims relating to liabilities and expenses incurred by an underwriter such as NatWest in connection with securities litigation." (Doc. # 805 at 6) Although DLJ fully adopts

do not address the § 510(b) issue beyond stating that its administrative expense claims can not be subordinated under § 510(b). However, as stated above, I find that the O & D Claimants' claims are not allowable as administrative expense claims.

To determine the meaning of § 510(b), I must first look to its language and determine if the language of the statute is ambiguous. *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989). If the language is unambiguous, the inquiry ends. *Id.* However, if the language is ambiguous, or if the literal application of the plain meaning "will produce a result demonstrably at odds with the intention of its drafters," then the intent of Congress needs to be examined in construing the statute's meaning. *Id.*

As discussed below, I find that the plain language of § 510(b), its legislative history, and applicable case law clearly show that § 510(b) intends to subordinate the indemnification claims of officers, directors, and underwriters for both liability and expenses incurred in connection with the pursuit of claims for rescission or damages by purchasers or sellers of the debtor's securities. The meaning of amended § 510(b), specifically the language "for reimbursement or contribution ... on account of [a claim arising from rescission or damages arising from the purchase or sale of a security]," can be discerned by a plain reading of its language.

Prior to its amendment in 1984, § 510(b) provided that

[a]ny claim for recission [sic] of a purchase or sale of a security of the debtor or of an affiliate or for damages arising from the purchase or sale of such a security shall be subordinated for purposes of distribution to all claims and interests that are senior or equal to the claim or interest represented by such security.

In 1984, Congress amended § 510(b), which now reads as follows:

For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.[4]

NatWest correctly points out that Congress's 1984 amendment to § 510(b) was not accompanied by any legislative history. NatWest argues that amended § 510(b) is ambiguous and posits its view of the legislative history of the original version of the section to conclude that Congress could not have intended the result argued for by MAWS. In support of its position, NatWest repeatedly stresses its view of why the original § 510(b) was enacted:

The purpose of section 510(b) is to prevent *shareholders* from bootstrapping low priority equity interests into higher priority unsecured claims merely by claiming some sort of fraud in connection with the issuance of the securities.

(Doc. # 805 at 6)

Congress enacted section 510(b) to prevent equity holders from subverting the

---

NatWest's position and asserts that "no part of DLJ's claim should be subordinated under § 510(b)," (Doc. # 837 at 4) DLJ appears to argue only for excluding its attorneys' fees from § 510(b)'s scope, conceding that, under § 510(b), "only claims for indemnification of liability are claims that are 'allowed ... on account of' a 'damages' claim in the securities fraud action." (Doc. # 837 at 5)

4.  Comparison of the old and the new § 510(b) is shown by the following—the added language underlined and deleted language in brackets:

*For the purpose of distribution under this title,* [any] *a* claim [for] *arising from* rescission of a purchase or sale of a security of the debtor or of an affiliate *of the debtor* [or], for damages arising from the purchase or sale of such a security, *or for reimbursement or contribution allowed under section 502 on account of such a claim,* shall be subordinated [for purposes of distribution] to all claims or interests that are senior *to* or equal [to] the claim or interest represented by such security, *except that if such security is common stock, such claim has the same priority as common stock.*

absolute priority rule and being treated as general unsecured creditors....

(Doc. # 805 at 7)

[T]he primary rationale for section 510(b) subordination is that shareholders buy into a particular, subordinate position and should not be able to elevate their claims by suing for recision [sic].

(Doc. # 805 at 10)

[I]t is abundantly clear that the purpose of section 510(b) is to prevent shareholders from being treated like creditors.

(Doc. # 805 at 12)

From this premise, NatWest argues that this purpose

is in no way furthered by the subordination of liability and litigation expense claims of an underwriter such as NatWest. NatWest did not bargain for the shareholder suits nor for the expense it is required to incur to defend itself; it is not in the same position as the shareholders whose claims Congress intended to subordinate by virtue of section 510(b). Accordingly, NatWest's claim should be treated just as all other general unsecured claims, and not subordinated as if it was a shareholder's claim.

(Doc. # 805 at 10–11)

NatWest's conclusion is premised on too narrow a focus of the purpose of § 510(b). Although it is correct that the principal focus of Congress in 1978 was to subordinate shareholder securities law claims, Congress's intent was not so limited.[5] In its original adoption, Congress did not limit the application of § 510(b) to equity securities. Section 510(b) applies to claims arising from rescission or damages from the purchase or sale of a "security." The Bankruptcy Code defines the term "security" to include a "note," "bond," or "debenture." § 101(49)(A)(i), (iv), (v). Thus, by its plain terms § 510(b) is intended to apply to both debtholders and equityholders. *See Levine v. Resolution Trust Corp. (In re Coronet Capital Co.)*, 1995 WL 429494, *8 (S.D.N.Y. July 20, 1995) (citing *Kira v. Holiday Mart, Inc. (In re Holiday Mart, Inc.)*, 715 F.2d 430, 434 (9th Cir. 1983), for the proposition that § 510(b) is "written in terms of 'any claim for rescission of a purchase or sale of a security' without distinction between equity securities and debt securities" and "[c]ommentators have construed the statute to apply to both.").[6] In the case before me, we have both Noteholder claims and shareholder claims.

The legislative history of the original § 510(b) reflects Congress's intent to include security holders' claims generally—both debtholder claims as well as shareholder claims. Discussing a 1973 law review article authored by Professors John J. Slain and Homer Kripke, Congress stated that

[Professors Slain and Kripke] conclude that allocation of assets in a bankruptcy case is a zero-sum situation, and that rules of allocation in bankruptcy should be predicated on allocation of risk. The two risks to be considered are the risk of insolvency of the debtor and the risk of an unlawful issuance of securities. While both security holders and general creditors assume the risk of insolvency, Slain and Kripke conclude that the risk of illegality in securities issuance should be borne by those investing in securities and not by general creditors.

H.R.Rep. No. 595, at 195 (1977).

Thus, it is readily apparent that the rationale for § 510(b) is not limited to preventing

---

**5.** Although the reported decisions and most of the literature on § 510(b) speak in terms of securities law claims by purchasers and sellers, the claims contemplated by § 510(b) can also be based on other case law and statutory law dealing with fraudulent conduct generally, breach of fiduciary duty and similar types of misconduct. For purpose of convenience, I will simply refer to all these claims as securities law claims—the type of claim we see most often in the § 510(b) context.

**6.** The legislative history makes clear that Congress made no mistake in using the Bankruptcy Code defined term "security:"

[T]he ... subordination varies with the claim or interest involved. If the security is a debt instrument, the damages or rescission claim will be granted the status of a general unsecured claim. If the security is an equity security, the damages or rescission claim is subordinated to all creditors and treated the same as the equity security itself.

H.R.Rep. No. 595, at 359 (1977); S.Rep. No. 989, at 74 (1978).

shareholder claimants from improving their position vis-a-vis general creditors; Congress also made the decision to subordinate based on risk allocation. Consequently, when Congress amended § 510(b) to add reimbursement and contribution claims, it was not radically departing from an equityholder claimant treatment provision, as NatWest suggests; it simply added to the subordination treatment new classes of persons and entities involved with the securities transactions giving rise to the rescission and damage claims. The 1984 amendment to § 510(b) is a logical extension of one of the rationales for the original section—because Congress intended the holders of securities law claims to be subordinated, why not also subordinate claims of other parties (e.g., officers and directors and underwriters) who play a role in the purchase and sale transactions which give rise to the securities law claims? As I view it, in 1984 Congress made a legislative judgment that claims emanating from tainted securities law transactions should not have the same priority as the claims of general creditors of the estate.

Adhering to its narrow understanding of the original purpose of § 510(b), NatWest argues that "[b]roadening the scope of 510(b) to include claims of parties other than shareholders would signal a major expansion of the scope and purpose of section 510(b)." (Doc. # 805 at 11) It offers a "more likely" explanation:

> A more likely explanation is that Congress modified section 510(b) in furtherance of its original purpose: to prevent shareholders from bootstrapping a securities claim into a general unsecured claim. For example, if a shareholder had *some sort of* reimbursement or contribution claim as a result of the decrease in value of the shareholders' securities *that did not arise from the purchase or sale of a security,* such as a *contractual right* to indemnification independent of the purchase of the security, such shareholder could convert *its securities claim* into a general unsecured claim by pursuing its rights under the indemnification contract. In order to further the purpose of section 510(b), the amendment *could have been designed* to guard against such bootstrapping by su-

bordinating all securities-related claims of shareholders, regardless of the source of such claims. (Doc. # 805 at 11) (emphasis added)

I find this argument to be a speculative exercise and in conflict with the plain language of § 510(b). It is pure speculation to suggest that Congress had in mind "some sort of reimbursement or contribution claim as a result of the decrease in the value of the shareholders' securities." I have great difficulty in applying this concept to any type of shareholder/corporation transaction of which I am familiar. Indeed, I find a right of contribution to be an alien element in such a shareholder/corporation transaction. And because there is no 1984 amendment legislative history to aid in a search for meaning beyond the plain words of § 510(b), NatWest's argument cannot be seriously considered.

Furthermore, as I read it, the "some sort" of claim suggested by NatWest is not a securities law claim; it is a contract claim not within the scope of § 510(b). Section 510(b) covers claims that arise in connection with a purchase or sale of a security. NatWest's theoretical claim, as it states it in the above quote, "did not arise from the purchase or sale of a security."

The few reported decisions that address the issue before me support the conclusion that the Claimants' claims are subject to § 510(b)'s subordination. NatWest and DLJ cite the Ninth Circuit's decision in *Christian Life Center Litig. Defense Comm. v. Silva (In re Christian Life Center),* 821 F.2d 1370 (9th Cir.1987), for the proposition that § 510(b) does not require subordination of indemnity claims for the costs of defending security holder litigation, while MAWS counters that a later decision out of the Ninth Circuit, *Official Comm. Of Unsecured Creditors v. PaineWebber Inc. (In re De Laurentiis Entertainment Group),* 124 B.R. 305, 308 (C.D.Cal.1991), holds that § 510(b) requires subordination of such litigation cost claims.

In *Christian Life,* a church raised funds for church construction by selling shares in a trust fund. *Christian Life,* 821 F.2d at 1372. A group of trust fund purchasers sued the

church and its pastor for fraud and securities law violations after failing to recover their investment, and the church subsequently filed a bankruptcy petition. *Id.* The fraud claim against the pastor was tried and a jury found him not liable. *Id.* After trial, LDC, the group of attorneys representing the pastor and the other officers, submitted a claim against the estate for indemnity of the pastor's defense costs as a first priority administrative expense. *Id.* The bankruptcy court allowed the claim. *Id.* The creditors' committee and other creditors appealed. *Id.* The district court disallowed LDC's claim as an administrative expense and subordinated the indemnity claim to general creditors' claims. *Id.* LDC appealed. *Id.*

After deciding that LDC's claim was not allowable as an administrative expense, the *Christian Life* court took up the issue of whether the district court properly subordinated the claim pursuant to preamended § 510(b).[7] In so doing, the court looked to the purpose of § 510(b), which the court described as

> prevent[ing] equity stockholders or holders of other subordinated securities from converting their interests into higher priority general creditors' claims by asserting damages or rescission claims. Congress requires subordination of such claims because failure to subordinate the interests of shareholders to those of unsecured creditors would defeat the reasonable expectations of both. General creditors rely on the equity cushion created by the investment of shareholders and expect priority in bankruptcy. Shareholders in turn bargain for potential profit in exchange for

expected subordination of their interests in bankruptcy.[8]

*Id.* at 1375 (citations omitted).

The court then explored the committee's argument that those stated principles require the claim to be subordinated under § 510(b). The committee argued that if shareholders recovered damages from an officer of the debtor, and the officer in turn recovered by way of indemnity from the estate as an unsecured claimant, the shareholders would achieve indirectly what § 510(b) prevents them from achieving directly, thus avoiding the subordination of their equity interests and defeating the expectations of unsecured creditors. *Id.* at 1375–76. The court rejected the committee's argument because the claims at issue in the case were for litigation costs, not for reimbursement for an officer's liability to security holders. *Id.* at 1376. The court stated that "security holders recover[ ] nothing from the officers when the latter are merely indemnified for defense costs." *Id.* The court then ended its discussion by concluding that § 510(b) did not require subordination of indemnity claims for defense costs. *Id.*

In *De Laurentiis*, PaineWebber had entered into a series of underwriting agreements with the debtor, which included promises by the debtor that it would reimburse PaineWebber for litigation expenses incurred should it be sued in connection with the offerings. *De Laurentiis*, 124 B.R. at 306. PaineWebber was subsequently sued by securities holders on the theory that the prospectuses and SEC registration statements contained misstatements of fact. *Id.* at 306–07. PaineWebber claimed to have incurred over $800,000 in attorneys' fees in connection with defending itself in the suits, and assert-

---

7. The court recognized Congress's 1984 amendment to § 510(b), which added, *inter alia*, the "reimbursement or contribution" language, *see supra*. The court stated that "we need not and do not determine whether amended section 510(b) requires subordination of indemnity claims." *Id.* at 1375 n. 6.

8. I note that the *Christian Life* court, like NatWest, focuses on § 510(b)'s purpose to prevent elevating shareholders into creditor positions. As discussed below, to some extent the *DeLaurentiis* court follows *Christian Life* in that regard. Although § 510(b) obviously covers defrauded

shareholders' claims, as noted above, its purpose is not so limited. Congress clearly intended that debenture purchasers (*i.e.*, creditors, not shareholders) having securities law claims also are to be subordinated to general unsecured creditors. Understanding this (as discussed in more detail above at pages 824–826), it seems to me, makes it easier to understand the 1984 amendment to § 510(b) and why that amendment does not reflect a serious departure from its predecessor. Indeed, this may explain why Congress saw no need to make a legislative record in enacting the amendment.

ed a contract-based claim for the litigation expenses against the debtor. *Id.* at 307. The debtor subsequently filed its plan of reorganization, which subordinated the PaineWebber litigation expense claims pursuant to § 510(b). *Id.* PaineWebber filed a motion to have its litigation expense claim classified as general unsecured claim, which the debtor and the creditors' committee opposed. *Id.* The bankruptcy court granted PaineWebber's motion and classified the claim as a general unsecured claim. *Id.* The committee and the debtor appealed. *Id.*

The *De Laurentiis* court first examined the language of § 510(b). The court, citing *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989), stated that in interpreting § 510(b), it must first look at the language to determine if, on its face, it has plain meaning. *De Laurentiis*, 124 B.R. at 307–08. If so, then the court's inquiry should end unless " 'the literal application of a statute will produce a result demonstrably at odds with the intention of its drafters.' " *Id.* at 308 (quoting *Ron Pair*, 489 U.S. at 242, 109 S.Ct. 1026). The court agreed with the committee's argument that PaineWebber's claim for litigation costs pursuant to its indemnification agreement was a claim for reimbursement under § 510(b) because "[r]eimbursement by definition includes indemnification." *Id.* The court rejected PaineWebber's argument that § 510(b)'s language does not mandate subordination of litigation expense claims. Paine-Webber stated that § 510(b) did not mention litigation expense claims and, thus, the language must by interpreted by ascertaining congressional intent. *Id.* It asserted that the 1984 amendment language supported the litigation expense/liability claim distinction drawn in *Christian Life*. *Id.* PaineWebber focused on the words "on account of" in § 510(b) as revealing Congress's intent to subordinate only those reimbursement or contribution claims which would be passed on to the equity holders asserting damage or rescission claims; if Congress had meant to include litigation expense claims, it would have used the words "associated with," "related to," or "arising out of" in the reimbursement clause. *Id.* Noting that Black's Law Dictionary defines "on account" to mean

only "in part payment" or "in partial satisfaction," which did not have the limiting effect on which PaineWebber insisted, the court "decline[d] to adopt the novel interpretation proposed by PaineWebber and interprets 'on account of' consistent with its meaning in normal usage." *Id.* at 308. The court then found that the plain language of § 510(b) included claims for indemnification of litigation expenses and, thus, the inquiry would continue only if PaineWebber could show "that subordination of an underwriter's claim for indemnification of attorneys' fees in this case is 'demonstrably at odds with the intention of its drafters' and not within the intended scope of Section 510(b)." *Id.* (quoting *Ron Pair*, 489 U.S. at 242, 109 S.Ct. 1026).

The court found that PaineWebber, despite presenting "strong policy reasons to support [its] position," failed to meet its burden of showing that subordination of its claim would subvert congressional intent. *Id.* at 309–10. The court then set forth three policy reasons supporting its plain reading conclusion.

The court noted that the fair allocation of risk between creditors and shareholders was an important policy consideration that the *Christian Life* court did not discuss. By allowing PaineWebber to recover as a general unsecured creditor, the court believed that it would be shifting the risks associated with the issuance of stock from the underwriter, who is in a better position to evaluate such risks, to the general unsecured creditors. *Id.* at 310. The legislative history discussed above clearly supports this position. See *supra* pp. 824–826.

The court listed two additional policy considerations supporting its conclusion. First, an attorneys' fees exception to § 510(b) could potentially apply to all attorneys' fees claims in securities litigation, and not just those of the defendants. *Id.* Second, the court stated that failure to subordinate attorneys' fees claims may eliminate incentives to settle securities cases because indemnity claims against the debtor will be subordinated while litigation costs incurred in continuing to defend the lawsuit will be subsidized by the unsecured creditors. In articulating this last policy consideration, it is clear that the court

saw no basis to debate the issue of the underwriter's liability claim being subject to § 510(b):

> Additionally, the failure to subordinate attorneys' fees may eliminate an incentive to settle securities cases. The Committee highlights the fact that underwriters are not permitted to pass on their damage claims that result from litigation surrounding the issued securities. *If PaineWebber settles the case by agreeing to pay some damages, its indemnity claim against the debtor is subordinated.* However, under PaineWebber's theory, if PaineWebber continues to litigate, its litigation costs are subsidized by the unsecured creditors. Thus, PaineWebber's interpretation of the statute could act as a disincentive to settlement.

*Id.* at 310. (emphasis added)

Following *DeLaurentiis,* the court in *In re Public Serv. Co.,* 129 B.R. 3, 5 (Bankr.D.N.H. 1991) likewise found § 510(b) unambiguous and the claimants' arguments for a differing interpretation wanting. The court found that officers' and directors' reimbursement claims, both as to damages and attorneys' fees, are to be subordinated under § 510(b). *Id.* at 5.

In summary, I conclude that § 510(b) is unambiguous in requiring the subordination of Claimants' reimbursement claims, both for liability and expenses, resulting from securities law claims by purchasers or sellers of a debtor's securities. This conclusion is consistent with the legislative history and is supported by the reported decisions addressing the issue. NatWest's argument to the contrary about what Congress might have intended in 1984 is misconceived.

## CONCLUSION

For the reasons set forth above, the O & D Claimants administrative expense priority claims are disallowed and the Claimants' claims are subordinated pursuant to § 510(b) and therefore will be treated as Class 7 claims in MAWS's Plan.

Counsel for MAWS should submit an order on notice.