In re NORTH AMERICAN PETRO-
LEUM CORPORATION USA,
et al., Debtors.

Compass Bank, Administrative Agent, as Successor in Interest to Guaranty Bank, FSB, And Texas Capital Bank, N.A., Co–Agent, Plaintiffs,

v.

North American Petroleum Corporation USA, Prize Petroleum LLC and Equal Energy U.S., Inc., as Successor to Altex Energy Corporation and Enterra Acquisitions Corp., Defendants.

North American Petroleum
Corporation USA, et
al., Plaintiffs,

v.

Equal Energy U.S. Inc. f/k/a Enterra Acquisitions Corp. and Successor in Interest to Altex Energy Corp. and Equal Energy Ltd. f/k/a Enterra Energy Corporation & Enterra Energy Trust, Defendants.

Bankruptcy No. 10–11707 (CSS).
Adversary Nos. 10–51624 (CSS),
10–51675(CSS).

United States Bankruptcy Court,
D. Delaware.

Feb. 18, 2011.

Evelyn J. Meltzer, David M. Fournier, John Henry Schanne, II, Pepper Hamilton LLP, Wilmington, DE, Amy Osberg Roberts, Carl E. Glaze, Nicole Ruble Metcalf, Jackson Walker LLP, Dallas, TX, Mark D. Christiansen, Oklahoma City, OK, Robert S. Hertzberg, Pepper Hamilton LLP, Detroit, MI, for Plaintiffs.

Domenic E. Pacitti, Margaret M. Manning, Klehr Harrison Harvey Branzburg LLP, Travis A. McRoberts, Richards, Layton & Finger, P.A., Wilmington, DE, for Defendants.

Garvan F. McDaniel, Mary E. Augustine, Bifferato Gentilotti LLC, Wilmington, DE, Michael G. Colvard, Martin & Drought, P.C., San Antonio, TX, for Intervenor.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW[1]

CHRISTOPHER S. SONTCHI, Bankruptcy Judge.

On December 15, 16, and 17, 2010, the Court conducted an evidentiary hearing on Counts 1, 2 and 7 of Debtors'[2] Complaint filed in Adversary Proceeding No. 10–51675 (CSS) ("Debtors' Adversary Proceeding") and Equal Energy's Request for Payment of Administrative Expenses Pursuant to 11 U.S.C. §§ 503(b)(1)(A) and 507(a)(2) (Case No. 10–11707 at Docket No. 129) (the "Administrative Claim"). The Banks[3] intervened in Counts 1, 2, and 7 of Debtors' Adversary Proceeding and are respondents to the Administrative Claim. Appearing at trial were counsel for the Debtors, Equal Energy,[4] the Banks, and the Official Committee of Unsecured Creditors.

The Court has reviewed and considered the arguments of counsel, the testimony of witnesses (including testimony by deposition), the exhibits admitted into evidence at trial and the documents and pleadings filed in connection with Equal Energy's Administrative Claim and Counts 1, 2, and 7 of Debtors' Adversary Proceeding and the entire record before the Court.[5] Based upon the entire record, these are the Court's findings and conclusions, pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable by Federal Rule of Bankruptcy Procedure 7052.

## PROCEDURAL HISTORY

### A. THE PARTIES

1. NAPCUS is a Delaware corporation with its principal place of business in Denver, Colorado. SOF, ¶ 1.[6] Prize is an Oklahoma limited liability company with its principal place of business in Denver, Colorado. *Id.* The Debtors operate an independent oil and gas exploration and

---

1. On January 24, 2011, the Court issued its *Preliminary Findings of Facts and Conclusions of Law* (D.I. 177) (the "Preliminary Findings"). This supplements the Preliminary Findings and is the Court's final findings of facts and conclusions of law. To the extent that this Final Ruling and the Preliminary Ruling are inconsistent, the Final Ruling shall govern.

2. North American Petroleum Corporation USA ("NAPCUS") and Prize Petroleum LLC. ("Prize") are collectively referred to herein as the "Debtors."

3. Compass Bank, as administrative agent under the Amended and Restated Credit Agreement, successor in interest to Guaranty Bank, FSB and Texas Capital Bank, N.A., as Agent are collectively referred to as the "Banks."

4. Equal Energy U.S. Inc., formerly known as Altex Energy Corporation and successor-in-interest to Enterra Acquisitions Corp., and Equal Energy Ltd., successor-in-interest to Enterra Energy Corp. and Enterra Energy Trust are collectively referred to herein as "Equal Energy."

5. References to exhibits herein are to the corresponding exhibits admitted into evidence during the hearing. References to "Trial Tr." are to the transcripts of proceedings on December 15–17, 2010, respectively.

6. References to "SOF" are to the Joint Pre-Trial Memorandum filed on December 10, 2010 (Adv. D.I. 114).

production company with activities primarily in Oklahoma (specifically, the "Hunton Resource Play"). *Id.* Petroflow Energy Ltd. ("Petroflow") is the parent company of both NAPCUS and Prize. *Id.* Petroflow is not a party in this adversary proceeding. *See* Trial Tr., 186:11–13; Moodie Depo. Tr., 19:2–18.[7]

2. Equal Energy U.S. Inc. f/k/a Enterra Acquisitions Corp. and successor-in-interest to Altex Energy Corporation is an Oklahoma corporation with its principal place of business in Oklahoma City, Oklahoma. SOF, ¶ 2. Equal Energy Ltd. f/k/a Enterra Energy Corporation and Enterra Energy Trust is a corporation organized pursuant to the province of Alberta, Canada. *Id.* Equal Energy are oil and gas exploration and production companies operating in Oklahoma and Canada. *Id.;* Trial Tr., 184: 5–15.

3. Compass Bank, Administrative Agent, as successor-in-interest to Guaranty Bank, FSB, is an Alabama banking corporation with its principal place of business in Alabama. SOF, ¶ 3.

4. Texas Capital Bank, N.A., is a national banking association with its principal place of business in Texas. SOF, ¶ 4.

**B. PROCEDURAL HISTORY**

5. On May 25, 2010 (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). SOF, ¶ 27. The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. *Id.*

6. On July 6, 2010, the Court entered its *Final Order (A) Authorizing the Debtors' Use of Cash Collateral, (B) Granting* *Adequate Protection and (C) Granting Related Relief* (the "Cash Collateral Order"). SOF, ¶ 28 (citing Cash Collateral Order, PTX 715).

7. Also on July 6, 2010, the Court entered its *Interim Order (I) Granting Interim Relief on Equal Energy's Emergency Motion for Relief From Stay and (II) Scheduling a Final Hearing* (hereinafter the "Athena Order") (Case No. 10–11707 at Docket No. 118).

8. On July 15, 2010, the Debtors initiated an adversary proceeding by filing a *Complaint for Recharacterization of the CRA against Equal Energy.* SOF, ¶ 29 (citing Debtors' Adversary Proceeding, PTX 714). Among other things, the Debtors' Complaint requests, *inter alia,* the following relief: (1) declaratory judgment on whether the CRA (defined below) can be recharacterized as a financing agreement (Count 1); (2) alternatively, in the event that the CRA is not recharacterized, an order that the Debtors may avoid payments made or obligations incurred under the CRA as fraudulent transfers (Count 2); and (3) declaratory judgment finding that Debtors do not owe payments under the CRA as administrative expenses (Count 7). SOF, ¶ 29 (citing Debtors' Adversary Proceeding, PTX 714 at ¶¶ 63–73, 96–100).

9. Also on July 15, 2010, Equal Energy filed its Administrative Claim. SOF, ¶ 30 (citing Administrative Claim, PTX 322). Equal Energy's Administrative Claim alleges that (1) Equal Energy is entitled to additional administrative expense treatment for the Debtors' post-petition use of the SWD Infrastructure; and (2) the Debtors owe money under the CRA for reimbursement of capital expenses or, in the alternative, the Debtors must pay a market rate to Equal Energy for the dis-

---

**7.** References to "_____ Depo. Tr." are to the deposition designations admitted into evidence in conjunction with the hearing.

posal of the waste saltwater generated from the Debtors' working interest share of the producing wells previously drilled under the Farmout Agreement. SOF, ¶ 30 (*citing* Administrative Claim, PTX 322 at ¶¶ 10–12). Equal Energy seeks an administrative expense claim in one of two proposed amounts: (1) the CRC (defined below) payments; or (2) a monthly payment of approximating fifty cents per barrel for saltwater disposal. (*See* Administrative Claim, PTX 322 at ¶ 23). Specifically, Equal Energy seeks an administrative expense in the amount of $1,200,000 to be paid immediately plus between $700,000 and $1,000,000 per month to be paid until the earlier of a sale of substantially all of the Debtors' assets or the confirmation of a plan of reorganization. (*See* Administrative Claim, PTX 322 at Prayer).

10. On August 13, 2010, Equal Energy filed a motion to dismiss the Complaint, or alternatively, for a more definite statement. SOF, ¶ 31 (*citing* Dismissal Mot. (Case No. 10–11707 at Docket No. 6)).

11. On August 30, 2010, the Court issued an order to consolidate counts 1, 2 and 7 of the Complaint and the Administrative Claim. SOF ¶ 32 (*citing* Case No. 10–11707 at Docket No. 254).[8]

12. On December 1, 2010, the Court issued an order denying Equal Energy's motion to dismiss the Debtors' Complaint. SOF, ¶ 33 (*citing* Case No. 10–51675 at Docket No. 101).

13. This Trial considered Equal Energy's Administrative Claim and Counts 1, 2, and 7 of the Debtors' Adversary Proceeding. The trial to consider the remaining Counts of the Debtors' Adversary Proceeding and the Banks' Adversary Proceeding is set to commence in April, 2011.

## FINDINGS OF FACTS

14. To support their drilling activities, the Debtors entered into a senior secured credit agreement (collectively, together with any additional amendments thereto, the "Credit Agreement"), originally dated August 25, 2005, with Texas Capital Bank, N.A., as Administrative Agent, and Guaranty Bank, FSB, as Co–Agent Bank, on behalf of the lender parties thereto, to provide the Debtors with a term and revolving credit facility that over time was increased to potentially provide loans up to $200 million. SOF, ¶ 5. Compass Bank has since succeeded Guaranty Bank as successor Co–Agent Bank under the Credit Agreement. *Id.* Approximately $105 million remains outstanding under the Credit Agreement. *Id.*

15. In late 2005, the Debtors approached Equal Energy with a potential opportunity to acquire some producing oil and gas assets the Debtors had identified in the Hunton Resource Play in Oklahoma. Trial Tr., 50:23, 53:8–18; Trial Tr., 185:5–9; SOF, ¶ 7; Defendants' Exhibit 801, at p. 1. The potential acquisition was too large for the Debtors to pursue on their own. Trial Tr., 53:11–12; Trial Tr., 185:21–22; Trial Tr., 72:1–9. So the Debtors approached Equal Energy to see if Equal Energy would be interested in buying the producing assets and then giving the Debtors the opportunity to take a "farmout" on the development of the Hunton Resource Play. Trial Tr., 53:13–17.[9]

---

8. The Court has scheduled a hearing in April 2011 to hear counts 3, 4, 5 and 6 of the adversary proceeding. D.I. 21.

9. A "farmout" is a traditional way of distributing capital risk in the oil and gas business. Under a typical farmout agreement, the land owner and/or owner of the mineral rights enters into a contract with a company specializing in exploration and drilling for hydrocarbons. The drilling company incurs the expenses and costs associated with drilling, including the construction of infrastructure.

16. Since 2006, the Debtors and Equal Energy have conducted business under a number of agreements involving the production of natural gas and oil in the Hunton Play in Oklahoma.

17. In January, 2006, NAPCUS entered into a letter agreement with Equal Energy's predecessor (PTX 302) (the "Letter Agreement"). The stated purpose of the Letter Agreement was to "express the understanding and agreement of [NAPCUS] and [Equal Energy] regarding the acquisition of oil and gas properties by [Equal Energy] under the Purchase and Sale Agreements . . . and following such acquisition, the development of those oil and gas properties." In the Letter Agreement, the parties agreed that: a) Equal Energy would acquire various properties; b) development of the properties would be governed by a farmout agreement "substantially in the form" attached to the Letter Agreement; and c) the form farmout agreement was subject to further revision. The parties commenced operations in March, 2006.

18. The parties then entered into the "Farmout Agreement." The Farmout Agreement was executed in the summer of 2006 but was retroactive to March 1, 2006. Under the Farmout Agreement, NAPCUS agreed to finance 100% of costs to drill, complete, and equip wells in return for a 70% interest in Equal Energy's working interest in the oil and gas leases in the units to be formed for those wells. In each case, however, there are third-parties that own a portion of the working interests. On average, Equal Energy's working interest in the producing wells is approximately 87%. NAPCUS's holds 70% of Equal's 87% working interest, which equates to an approximate 61% working interest in the wells overall.[10]

19. After NAPCUS drilled and completed a producing well and equipped it for production, Equal Energy assumed operation of the well. SOF, ¶ 10. NAPCUS, as well-operator during the drilling of the oil and gas wells, paid directly 100% of NAPCUS's and Equal Energy's share of the cost (that is, the net of that paid by third party working interest owners) of drilling and completing and equipping the new wells drilled pursuant to the Farmout. SOF, ¶ 13. Sixty-four (64) wells were ultimately drilled pursuant to the Farmout. SOF, ¶ 8. Of these sixty-four (64) wells, sixty-two (62) were producing wells and two (2) were dry holes. *See* Defendants' Exhibit 857.

20. A tremendous amount of saltwater is extracted from the ground as part of the drilling and production process in the Hunton Play. After the saltwater is separated from the hydrocarbons, it must be removed from the site and properly disposed. This is done by using wells to inject the saltwater into the underground formations from whence it came. To dispose of the saltwater, the Debtors and Equal Energy concluded that there was a need to upgrade pre-existing saltwater disposal infrastructure ("Existing SWD Infrastructure") and also to build new saltwater disposal infrastructure ("Additional SWD Infrastructure", and, collectively with the Existing SWD Infrastructure, the "SWD Infrastructure"). The Debtors have to complete the drilling process and the SWD

---

In exchange, the drilling company receives a large percentage of the land owner's working interest in the well. Trial Tr., 191:6–15.

**10.** The parties' business arrangement was also meant to be governed by a Joint Operating Agreement or JOA, a form of which was attached as an exhibit to the Farmout Agreement. Although a JOA was never executed, the parties gave the form JOA full force and effect, regularly referring to its terms in conducting their business.

infrastructure has to be built or upgraded and connected and ready to receive saltwater from any well drilled by NAPCUS before hydrocarbons can be produced from those wells. After NAPCUS drilled and completed a well and equipped it for production, Equal Energy assumed operation of the well. SOF, ¶ 9.

21. NAPCUS was obligated to pay its share as well as Equal Energy's share of the cost of drilling, completing, and equipping the wells. This included the obligation to pay each party's share of the cost of updating and/or building the SWD Infrastructure.[11] NAPCUS did not have sufficient capital to cover both drilling and the SWD Infrastructure. Consequently, under the Capital Recovery Agreement or CRA, Equal Energy agreed to finance NAPCUS's obligation to pay for the SWD infrastructure. *See* Trial Tr. 61:21–62:16; 63:10–18; 77:11–23; Boerchers Dep. 143:1–19; Moodie Dep. 73:22–74:22; Tyndall Dep., 105:13–18.

22. The CRA took over a year to negotiate and was executed by the parties in the fall of 2007. Under the CRA, Equal Energy funded and constructed any Additional SWD Infrastructure required and NAPCUS agreed to pay 100% of NAPCUS's and Equal Energy's share of the cost of the Additional SWD Infrastructure over a three-year period with 12% interest. That obligation is referred to in the CRA as the "Capital Recovery Charge" or "CRC". *See* PTX 327, Ex. A.

23. Under the terms of the CRA, the Debtors make two distinct payments. Invoices related to the Capital Recovery Charge, i.e., the Monthly Capital Commitment, are submitted by Equal to NAPCUS on a monthly joint-interest billing (known as a "JIB") that sets forth the principal and interest payments due. Equal Energy issues a separate monthly JIB to Prize (NAPCUS's affiliate and co-debtor) seeking payment of the Debtors' pro rata share of Equal Energy's operating expenses (such as electricity, maintenance, labor and overhead expenses) related to the operation of the wells, including the operation of the SWD infrastructure.[12] SOF, ¶ 26; Trial Tr., 67:3–19, Trial Tr., 132:21–133:3.

24. The CRA contains a number of additional provisions governing the parties' relationship, including:

a. Equal Energy, the operator of the wells, is required to dispose of saltwater produced from the wells into the SWD infrastructure and has the right to charge NAPCUS for its working interest share of the actual cost of that disposal. PTX 327.

b. In the event that Equal Energy sells any of the SWD infrastructure to a third party, the consideration received from such a sale shall first be applied to pay down any outstanding balance owed by the Debtors to Equal Energy under the CRA, and then shall be "distributed pro rata (70/30) between [NAPCUS] (70) and [Equal Energy] (30)." SOF, ¶ 22 (citing PTX 327 at ¶ 10(h)).

c. Any property tax payments and insurance premiums incurred by Equal Energy as operator and associated with the SWD infrastructure are to be billed to NAPCUS through the NAPCUS JIB's on the basis of 70% of the amount not billed to oth-

---

11. Third party working interest holders pay their pro rata share of all costs.

12. Unlike the costs related to drilling and construction of the SWD infrastructure, the Debtors only pay their pro rata share of operating expenses (based upon their share of the well's working interest) and do not cover Equal Energy's share of operating expenses.

ers, the remaining 30% being Equal Energy's obligation. SOF, ¶ 23.

d. NAPCUS received an unlimited right to use the SWD Infrastructure indefinitely to dispose of saltwater from the wells. PTX 327, § 9(a), Ex. A.

e. Equal has no right to exclude NAPCUS from using the SWD Infrastructure, subject only to minor operational issues. Trial Tr., 87:25–88:7 ("The CRA provides that [Equal] . . . can deny water from NAPCUS if there's something about the water, there's some foreign material in the water or if there are capacity issues. . . . But other than that no, they can't exclude NAPCUS from using it.").

f. In the event that the Debtors sell any, or all, of their working interest in the wells to a third-party, the third party has the right to use the associated SWD Infrastructure on the same terms as the Debtors. *See* PTX 327 at ¶ 10(f).

g. The term of the CRA runs throughout the life of the Farmout Agreement, which itself has an indefinite term. *See* PTX 327 at ¶ 9(b); *see* PTX 300 at § 5.

25. The CRA includes no provision creating a security interest in any asset of the Debtors to support payment of the obligations created by the financing provision of the CRA. (PTX 327).

26. Prior to the Debtors' filing of bankruptcy, Equal Energy provided the Debtors with notice of the termination of the Farmout Agreement due to the Debtors' alleged lack of performance of its drilling obligations under the Farmout Agreement. Equal Energy contended that such notice effected the termination of the Farmout Agreement. The Debtors disputed and contested the validity of that termination.

This dispute was scheduled for arbitration in January, 2011. Prior to arbitration, the parties reached an agreement settling the dispute and agreeing, among other things, for the termination of the Farmout Agreement. D.I. 610. The Court has approved that settlement. D.I. 643.

27. As set forth above, the Debtors have filed a complaint against Equal Energy seeking: (i) a declaratory judgment that the CRA should be recharacterized as a financing agreement; (ii) alternatively, in the event that the CRA is not recharacterized, avoidance of any payments made or obligations incurred under the CRA as fraudulent transfers; and (iii) a declaratory judgment that Equal Energy is not entitled to receive payment of administrative expenses for any amounts due under the CRA. Equal Energy disputes the Debtors' claims.

28. The Court heard expert testimony regarding the Debtors' claims of fraudulent transfer:

a. Sudhin Roy is the President and Senior Managing Director for Kinetic Advisors LLC, a national firm focused on providing financial advisory, capital solutions and corporate restructuring services to middle-market companies in various industries and testified on behalf of the Debtors. Defendants' Exhibit 80, Roy Report, p. 20. Mr. Roy has over 17–years of experience leading corporate restructurings, M & A transactions and capital raising efforts. *Id.,* p. 20. Mr. Roy was asked by the Debtors to opine on whether NAPCUS (i) was left with inadequate capital to remain financially viable after execution of the CRA and (ii) received less than reasonably equivalent value for its investment in the SWD Infrastructure under the terms of the CRA. *Id.,* pp. 17–18. 77. Mr. Roy utilized a "single-well" methodology to calculate the aggregate economics of the

Farmout. Under this methodology, each well was assumed to have the same revenue and cost characteristics, differing only as to timing of production. *Id.*, p. 14. Under these assumptions, upon drilling 63 wells, NAPCUS would have incurred nearly $75 million in debt, exclusive of outstanding balances due under the CRA. *Id.*, p. 14. At average oil and gas prices between January 2006 and July 2010, Mr. Roy concluded that the net present value of each well is negative. *Id.*, p. 18. Mr. Roy further concluded that (i) the borrowing base provided by the reserves would have been inadequate to finance the business; (ii) it is unlikely that lenders would finance the operations in the absence of an equity investment; and (iii) it is unlikely that an equity infusion would have been forthcoming in light of the lack of adequate profitability of each well. *Id.*, p. 14. Accordingly, Mr. Roy concluded that from the time NAPCUS incurred the CRA obligations, the Debtors were engaged in or about to engage in a business or transaction for which they were inadequately capitalized to remain financially viable. *Id.*, p. 18. Mr. Roy further opined that NAPCUS did not receive reasonably equivalent value for its investment in the infrastructure under the CRA. *Id.*, p. 17.

b. Lisa Poulin is a managing partner at CRG Partners Group, LLC with thirty (30) years of experience as a financial advisor, accredited as, inter alia, a Certified Turnaround Professional and Certified Insolvency and Restructuring Advisor and testified on behalf of Equal Energy. *See* Trial Tr., 53:5–7, 54:24–55:2; Poulin Report, Exhibit XII (Resume of Lisa M. Poulin). Specifically, Ms. Poulin has extensive experience advising and providing expert analysis to debtors, creditors, and other interested parties operating in the commodities market, including the oil and gas industry. Trial Tr., 56:18–57:13. Ms. Poulin was asked by Equal Energy to opine regarding issues of fraudulent transfer, and specifically whether the Debtors (a) were insolvent at the time they entered into, or were rendered insolvent by entering into, the CRA, (b) were left with insufficient capital to operate as a result of entering into the transaction with Equal Energy, and (c) received reasonably equivalent value for the payments made pursuant to the terms of the CRA. Trial Tr. 56:5. Ms. Poulin concluded that (i) the Debtors were solvent between 2005 and 2008; (ii) the Debtors were continuously solvent during that period of time; and (iii) the Farmout and the CRA did not render the Debtors insolvent. Trial Tr., 58:5–11; Poulin Report, pp. 5–9. As indicated in detail in her report, the Debtors maintained a positive net asset value at all times between December 31, 2005, and December 31, 2008, with no intervening events that would have rendered the Debtors insolvent within this period. Poulin Report, p. 7. Ms. Poulin further concluded that (i) the CRA did not render the Debtors with insufficient capitalization; and (ii) the Debtors had sufficient capitalization between 2006 and 2008. Trial Tr., 58:5–11; 77:24—78:2; PTX 97, pp. 5–9. 99. Ms. Poulin also concluded that the Debtors received "reasonably equivalent value" in connection with the transaction(s) contemplated under the Farmout and the CRA. Trial Tr., 60:11–14. She testified that access to the salt water disposal facilities was "absolutely critical" to operation of the Debtors' business. According to Ms. Poulin, the Debtors received the following value: a) access to properties for development, costing Equal Energy approximately $245 million to acquire; b) 70% interest in the properties' undeveloped acreage; c) 70% interest in any sale proceeds if the properties were sold; d) access to salt water disposal facilities constructed by, and at the expense of Equal Energy; e)

access to existing salt water disposal facilities owned and operated by Equal Energy; f) the right to dispose of salt water at "cost," rather than substantially higher market rates; and g) the right to terminate the operative agreements. Trial Tr. 60:11–61:9; Poulin Report, pp. 11–12.[13]

29. On the other hand, Equal Energy asserts that (i) Equal Energy is entitled to administrative expense treatment for Debtors' post-petition use of the SWD Infrastructure; and (ii) the Debtors are obligated to pay Equal Energy the amounts due under the terms of the CRA, or in the alternative, the Debtors must pay Equal Energy $0.50 per barrel for the disposal of the waste salt water generated from the Debtors' working interest in the production wells. The Debtors disagree.

30. The Court heard testimony regarding the price per barrel of disposing salt water.

a. Commercial disposal wells charge different rates than non-commercial disposal wells. The saltwater disposal facilities relevant to these proceedings are non-commercial facilities.

b. Dennis Baggett is a regional manager at NAPCUS. Trial Tr., 99:4–20. Mr. Baggett was asked by the Debtors to opine on a single issue: whether $0.50/bbl was a reasonable fee to charge for salt water disposal. Trial Tr., 115:22–116:5, 130:21–131:11. Mr. Baggett concluded that the $0.50/bbl disposal fee was not reasonable and that the only reasonable charge would be the actual cost for disposing of the salt water, which, as discussed below, includes both capital and operating costs of the

disposal well. Trial Tr., 120:5–22; 123:17–124:8; 169:22–170:2.

c. Equal's expert Charles Kemp opined that $0.50 per barrel is a reasonable reflection of market conditions for saltwater disposal here, however Mr. Kemp analyzed only commercial disposal facilities. Trial Tr., 176:20–23, 177:6–8. Moreover, the U.S. Department of Energy survey on which Mr. Kent relied relates only to commercial saltwater disposal wells. Trial Tr., 184:22–185:2. And the invoices Mr. Kent reviewed related only to commercial saltwater disposal facilities. Trial Tr., 185:3–8.

d. Terry Brittenham, a consulting petroleum engineer testified as an expert witness on behalf of the Banks. Trial Tr., 125:5–16. A majority of Mr. Brittenham's background in the field took place in Oklahoma over the past twenty-five years—includes testifying before the Oklahoma Corporation Commission (the "OCC") as an expert in saltwater disposal rates and negotiating agreements and contracts related to saltwater disposal facilities. Trial Tr., 126:16–25, 128:2–24. Mr. Brittenham opined on two issues in the case: (1) whether the fifty cent per barrel fee Equal wished to charge NAPCUS for saltwater disposal was reasonable; and (2) if the fifty cent fee was not reasonable, what a more appropriate charge would be. Trial Tr., 132:19–133:1. After analyzing the costs underlying Equal's proposed fee, Mr. Brittenham concluded in his supplemental report (PTX 173) that: (1) the fifty cent fee "provides an economic return that is well beyond what is reasonable and necessary"; and (2) a more appropriate charge for saltwater disposal in this case would be

---

**13.** Further, Ms. Poulin compared her findings to that of Mr. Roy's and assessed Mr. Roy's Single Well Economics methodology. She concluded that Mr. Roy's single well analysis was neither a proper indicator of solvency nor the Debtors' receipt of reasonably equiva-

lent value. Trial Tr., 79:22–80:11; Poulin Report, pp. 9–11. Ms. Poulin rebutted Mr. Roy's analysis as extremely sensitive, meaning that his value conclusions changed dramatically with minimum adjustments to his assumptions.

eight cents per barrel. Brittenham, 12/16 Tr. at 133:2–13, 141:2–14.

## CONCLUSIONS OF LAW

### A. JURISDICTION AND VENUE

31. This Court has jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

14. The parties noted choice of law in the Letter Agreement (Colorado), the Farmout Agreement (Oklahoma), and the CRA (Oklahoma). As the Court holds *infra* that the JOA (which specifies that the choice of law is the state in which the "Contract Area" is located, i.e. Oklahoma) and Farmout Agreement to extent inconsistent are void and that the CRA is void in its entirety the Court, the Court finds that the choice of law situs could be disputed. However, the choice of law analysis is unwarranted as the law of Oklahoma, Colorado and Delaware (the forum of the bankruptcy cases) are substantially similar and the Court's analysis under each State's law would result in the same holdings.

15. **Oklahoma:** *Otis Elevator Co. v. Midland Red Oak Realty, Inc.*, 483 F.3d 1095, 1102 (10th Cir.2007) ("To determine whether a contract is ambiguous, a court must look to the language of the entire agreement, which must be given its plain and ordinary meaning unless some technical term is used in a manner intended to convey a specific technical concept. If a contract is ambiguous, extrinsic evidence is admissible to resolve the ambiguity." (citations and internal quotations omitted)); *Strickland v. American Bakery & Confectionery Workers Union*, 1974 OK 111, 527 P.2d 10 (Okla.1974) ("The rule is well established that although not executed at the same time, where two written instruments refer to the same subject matter and on their face show that each was executed as a means of carrying out the intent of the other, both should be construed as one contract." (citations omitted)); **Colorado:** *Talus Properties Ltd. Partnership v. Williams Natural Gas Co.*, 1995 WL 712655, at *2, 1995 U.S.App. LEXIS 33734, at *7 (10th Cir. Dec. 5, 1995) ("The intent of the parties must be determined from

### B. CONCLUSIONS OF LAW[14]

*(a) There Was No Contractual Relationship Between the Parties As There Was No Meeting of the Minds.*

 32. On their face, the JOA, Farmout Agreement, and CRA are an integrated contract. To the extent that the contracts can be considered ambiguous, the extrinsic evidence supports a finding that the contracts are integrated.[15]

the language of the contract itself, although a court may consider extrinsic evidence bearing upon the meaning of the written terms, such as evidence of local usage and the circumstances surrounding the making of the contract. Extrinsic evidence of intent is not admissible until the contract has been judged to be ambiguous." (citations omitted)); *United States v. Rockwell Int'l Corp.*, 124 F.3d 1194, 1199 (10th Cir.1997) ("Merely because a writing claims to be a final and exclusive expression of the parties' agreement does not in itself prohibit the court from looking beyond the document to see if other agreements exist between the parties." (citations and internal quotations omitted)); *O'Reilly v. Physicians Mut. Ins. Co.*, 992 P.2d 644, 648 (Colo.Ct.App. 1999) ("If a simultaneously executed agreement between the same parties, relating to the same subject matter, is contained in more than one instrument, the documents must be construed together to determine intent as though the entire agreement were contained in a single document." (citations omitted)); **Delaware:** *Eagle Indus. v. DeVilbiss Health Care*, 702 A.2d 1228 (Del.1997) ("Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language. When the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings, there is ambiguity. Then the interpreting court must look beyond the language of the contract to ascertain the parties' intentions." (citations and internal quotations omitted)); *Merchant-Wired, LLC v. Transaction Network Servs.*, 2005 WL 468241, 2005 Del.Super. LEXIS 61 (Del.Super.Ct. Feb. 28, 2005) ("Generally, all writings which are part of the same transac-

■ 33. Nonetheless, key provisions of the contracts (or, more precisely, contract) when read together are in conflict and, thus, ambiguous. *See infra* ¶ ¶ 36–47. Even when one considers the extrinsic evidence on these points, it is clear that there has never been a meeting of the minds by the Debtors and Equal Energy on the terms and conditions of the contract. ***Thus, there is not an existing contractual relationship among the parties.***

34. The Supreme Court of the United States has held: "There can be no contract without the mutual assent of the parties. This is vital to its existence. There can be none where it is wanting. It is as indispensable to the modification of a contract already made as it was to making it originally. Where there is a misunderstanding as to any thing material, the requisite mutuality of assent as to such thing is wanting; consequently the supposed contract does not exist, and neither party is bound. In the view of the law in such case, there has been only a negotiation, resulting in a failure to agree. What has occurred is as if it were not, and the rights of the parties are to be determined accordingly." [16]

■ 35. The Oklahoma Courts, in keeping with the Supreme Court, have adopted 66 Am. Jur. 2d Restitution and Implied Contracts, § 7 which states, in part:

The generally recognized doctrine is that the fact that a contract is invalid because the minds of the parties did not meet as to some of the essential terms thereof, either because of a mutual mistake or uncertainty therein, does not require that a party thereto who furnishes something to the other party, relying upon the terms as he understood them, be without a remedy. In such case a promise to pay the reasonable value of the benefits is implied. Nor is the implication of a promise necessarily precluded by the mere fact that an enforceable contract had previously been entered into by the same parties. Under some circumstances the contract may be treated as having been abrogated, and a recovery may be had on an implied promise to pay for benefits conferred thereunder. A party may be bound by an implied promise when he has made an express contract which has been rescinded or abandoned. [17]

---

tion are interpreted together." (citations and internal quotations omitted)).

**16.** *Utley v. Donaldson*, 94 U.S. 29, 47, 24 L.Ed. 54 (U.S.1900); *See also Board of Education v. American Nat'l Bank*, 294 F. 14, 20 (8th Cir.1923).

**17. Oklahoma:** *American Automated Theatres, Inc. v. Hudgins, Thompson, Ball & Assocs.,* 516 P.2d 565, 567–68 (Okla.Ct.App.1973) (*quoting* 66 Am. Jur. 2d Restitution and Implied Contracts § 7 (1973); *citing Conkling's Estate v. Champlin,* 193 Okla. 79, 141 P.2d 569 (1943); *Macsas v. Fishencord,* 190 Okla. 407, 124 P.2d 388 (1942) (internal quotation marks omitted)). *See also Great N. Ry. v. Sheyenne Tel. Co.,* 27 N.D. 256, 265, 145 N.W. 1062 (N.D.1914) (" 'It must be one in which there are mutual promises, or which is founded on a sufficient consideration. It must be one the terms of which are certain, and in

respect to which the minds of the parties have distinctly met so that there can be no misunderstanding of their rights and obligations.' " (*citing Metropolitan Exhibition Co. v. Ewing,* 42 F. 198, 199 (C.C.S.D.N.Y.1890))). **Colorado:** *Agritrack, Inc. v. DeJohn Housemoving, Inc.,* 25 P.3d 1187, 1192 (Colo.2001) ("[A] contract is created by the meeting of the minds to contract with each other."); *Brush Creek Airport, L.L.C. v. Avion Park, L.L.C.,* 57 P.3d 738, 745 (Colo.App.2002) (a contract exists only when there was mutual assent to all essential terms).

When the parties to an alleged contract assign different meanings to an essential term, a contract may or may not exist, depending on the nature of the term. Unless there is only one reasonable meaning for the term, courts generally conclude there is no meeting of the minds and, thus, no contract. *Sunshine v. M.R. Mansfield*

■ 36. Despite the lack of a formal contract, the parties have been engaged in a joint effort to exploit the natural resources in the Hunton Play since 2006 and continue to operate that business. In such an instance, the court must fashion an equitable remedy.[18]

37. The best way to understand the parties' arrangement and to support the adoption of an equitable remedy is to build it piece by piece. The JOA and Farmout Agreement, subject to key exceptions discussed below, are neither complicated nor ambiguous. Under a typical farmout agreement, the land owner and/or owner

*Realty, Inc.,* 195 Colo. 95, 98, 575 P.2d 847, 849 (1978); *Brush Creek Airport,* 57 P.3d at 745. Similarly, if the parties omit entirely an essential term, resulting in an alleged contract that is so uncertain the court cannot determine whether or not it has been breached, there is no contract. *Stice v. Peterson,* 144 Colo. 219, 224, 355 P.2d 948, 952 (1960); *see DiFrancesco v. Particle Interconnect Corp.,* 39 P.3d 1243, 1248 (Colo. App.2001); Restatement (Second) of Contracts § 33 cmts. a, f. While the court may supply some missing essential terms, *see Winston Financial Group, Inc. v. Fults Management, Inc.,* 872 P.2d 1356, 1358 (Colo.App.1994) ("[A] contract will not fail for indefiniteness if missing terms can be supplied by law, presumption, or custom."), it may not create a contract where there is none, *Stice,* 144 Colo. at 224, 355 P.2d at 952; *DiFrancesco,* 39 P.3d at 1248 ("While parties may definitely agree on some issues, the absence of agreement on other material issues prevents the formation of a binding contract.").
*Jorgensen v. Colo. Rural Props., LLC,* 226 P.3d 1255, 1260 (Colo.Ct.App.2010). **Delaware:** *Kennedy v. National Tube Co.,* 255 F. 1, 4 (3d Cir.1919) ("Instead of showing an understanding between the parties, even assuming that the purchasing agent of the defendant was acting with full authority from his principal, the evidence shows a misunderstanding between them, and, therefore, fails to show a meeting of their minds on a most material part of the proposed contract."); *Wood v. State,* 815 A.2d 350 (Del.2003) ("The formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration." (citations omitted)); *Gleason v. Ney,* 1981 WL 88231, *1, 1981 Del. Ch. LEXIS 598, *1–2 (Del. Ch. Aug. 25, 1981) ("An express contract cannot arise in the absence of an agreement or mutual assent of the parties. In order for there to be an agreement, the parties must have a distinct intention common to both and with-

out doubt or difference. Until all understand alike there can be no assent and therefore no contract. Both parties must assent to the same thing, in the same sense and at the same time. Their minds must meet to all the terms. If any portion of the proposed terms is not settled there is no agreement." (citations omitted)); *Rodgers v. Erickson Air–Crane Co., L.L.C.,* 2000 WL 1211157, 2000 Del.Super. LEXIS 259 (Del.Super.Ct. Aug. 17, 2000) ("Where there is no meeting of the minds, there is no enforceable contract in Delaware. And, normally there is no contract until agreement is reached on all material terms; the preliminary and partial agreements being expressly or impliedly incorporated into the final offer and acceptance." (citations omitted)).

18. **Oklahoma:** *Williams v. Moore Med. Ctr., L.L.C. (In re Moore Med. Ctr., L.L.C.),* 2010 WL 3366411, *5, 2010 U.S. Dist. LEXIS 86630, *18 (W.D.Okla. Aug. 23, 2010) ("In Oklahoma, the equitable doctrine of promissory estoppel gives a person who reasonably relies to his detriment on another's promise is given by law the benefit of a contract wherein an agreement did not come to fruition." (citations and internal quotations omitted)). **Colorado:** *Interbank Invs. v. Eagle River Water & Sanitation Dist.,* 77 P.3d 814, 816 (Colo.Ct. App.2003) ("[C]ourts may imply a contract in law, often termed a quasi-contract, and allow recovery to serve the law of natural immutable justice and equity.... For example, quasi-contractual recovery may be allowed when an express contract failed or was rescinded." (citations and internal quotations omitted)). **Delaware:** *Official Comm. of Unsecured Creditors of Fedders N. Am., Inc. v. Goldman Sachs Credit Partners L.P. (In re Fedders N. Am., Inc.),* 405 B.R. 527, 552 (Bankr.D.Del.2009) ("[U]njust enrichment is an equitable remedy that is generally used to fill a gap that the law of contract would otherwise address, if there were a contract." (citation omitted)).

of the mineral rights enters into a contract with a company specializing in exploration and drilling for hydrocarbons. The drilling company incurs the expenses and costs associated with drilling, including the construction of infrastructure. In exchange, the drilling company receives a large percentage of the land owner's working interest in the well. In this instance, the Debtors received 70% of Equal Energy's working interest.[19] Once the well begins producing, the working interest owners reimburse the operating company (which may or may not be the drilling company) on a *pro rata* basis for the operating costs incurred in connection with the well. In this case, Equal Energy is the operating company.

38. Often the drilling company bears the entirety of the risk associated with drilling. In the event that the result is a dry well, the drilling company will not be reimbursed for its costs and expenses associated with drilling, including any infrastructure it has created. In the event that the well is successful, the drilling company will only be responsible for its *pro rata* share of operating expenses, which are on "above line" expense. In addition, the drilling company will receive the lion's share of the land owner's working interest-in this case, 70%.

39. Under this arrangement, the drilling company is the owner of any and all equipment used in the exploration and exploitation process. For example, the pumps, pipes, electrical wires, etc. belong to the drilling company. To the extent, however, such equipment becomes so integrally attached to the landscape, it may become in the nature of a fixture and title would pass to the land owner.[20]

40. This was exactly the parties' relationship with regard to the exploration and drilling for oil and natural gas, in and of itself. The Debtors have the responsibility of exploring and drilling. They cover 100% of their pro rata share of the drilling expenses as well as 100% of Equal Energy's expenses. As such, the Debtors bear the risk associated with drilling.

19. In this case, the third party owners of working interests paid their pro rata share of the drilling expenses. The Debtors, however, paid Equal Energy's pro rata share of drilling costs in exchange, in part, for 70% of Equal Energy's working interest.

20. **Oklahoma:** *Goad v. Buschman Co.*, 2008 WL 906173, 2008 U.S. Dist. LEXIS 27297 (N.D.Okla. Mar. 31, 2008) ("60 O.S. § 6 provides that 'a thing is deemed to be affixed to land when it is . . . permanently attached to what is thus permanent, as by means of cement, plaster, nails, bolts or screws.' " (citations omitted)). **Colorado:** *Ferganchick v. Johnson*, 28 Colo.App. 448, 450, 473 P.2d 990 (Colo.Ct.App.1970) ("The general tests for determining whether a particular object has become a fixture are usually said to comprise annexation to the realty, adaptation to the use to which the realty is devoted, and intention that the object become a permanent accession to the freehold." (citations and quotations omitted)). **Delaware:** *Tallent v. Meredith*, 1988 WL 67866, at *4, 1988 Del.Super. LEXIS 234, *13 (Del.Super. Ct. June 20, 1988) ("[I]n order to determine whether or not a chattel has been sufficiently annexed to the realty to become a fixture, the controlling test is the intention of the party making the annexation as revealed by the surrounding circumstances. Various factors to be considered are the nature of the chattel, the method of annexation, the purpose or use for which the annexation has been made and the relationship of the annexor to the property. The Supreme Court has stated that the true test is whether or not the chattel was affixed to the realty for a temporary or a permanent purpose." (citations omitted)); *Atlantic Refining Co. v. Feinberg*, 31 Del. 183, 188, 112 A. 685 (Del.Super.Ct.1920) ("A fixture has been defined as a thing which, though originally a movable chattel, is, by reason of its annexation to land, regarded as a part of the land, partaking of its character, and belonging, in the ordinary case at least, to the person or persons owning the land.").

41. The relationship, however, is complicated by the fact that drilling in the Hunton Play produces a tremendous amount of salt water. That salt water must be processed and disposed, generally by injecting it back into the formation from whence it came.

42. Under the "typical" farmout agreement and JOA discussed above, one would expect the drilling company to build the SWD infrastructure. That, however, was not the case. Under the CRA, Equal Energy builds and operates the SWD infrastructure. The Debtors are required to reimburse Equal Energy for 100% of the cost of upgrading the Existing SWD Infrastructure and building the Additional SWD infrastructure. In addition, Equal Energy and the Debtors are each responsible for their own pro rata share of operating expenses for the SWD infrastructure.

43. Assuming that was the extent of the parties agreement, one could think of it as if Equal Energy was operating as a subcontractor for the Debtors, the party which would normally have the responsibility to build the infrastructure associated with drilling. As such, Equal Energy would be entitled to complete reimbursement of its costs for construction (with a profit). As an operator/subcontractor, Equal Energy would only be responsible for its pro rata share (due to its working interest) of operating expenses.

44. The person that owns the property upon which a subcontractor is working generally owns the infrastructure and equipment built upon it by the subcontractor. However, the subcontractor retains an equitable lien in the property until it is paid in full. Thus, if one were to think of the parties' relationship in this manner, the contracts would reflect that the Debtors owned the drilling infrastructure *and* the SWD infrastructure and Equal Energy would have an equitable lien in the SWD infrastructure until it was paid what it was due.

45. That was not the parties relationship. First, as to the costs of upgrading and constructing the SWD infrastructure, the Debtors were required to reimburse Equal Energy for the entirety of both the Debtors' and Equal Energy's pro rata share of construction costs. Because the Debtors did not have sufficient funds to pay upfront or even reimburse as the expenses were incurred, the CRA provided that the Debtors' reimbursement obligations would be amortized over 36 months with an interest rate of 12%. Thinking back to our subcontractor analogy, this, in and of itself, does not change the parties' relationship. In effect, the subcontractor would be providing financing terms to the contractor. Although certainly more complicated than 30 days net, etc., it is fundamentally the same thing. The subcontractor would be providing credit to the Debtors, i.e., a loan, secured by an equitable lien.

46. *The CRA, however, provides that Equal Energy owns the SWD infrastructure and the Debtors have a perpetual right to use the SWD infrastructure,* subject, of course, to the Debtors' obligation to pay their pro rata share of the operating expenses, i.e., the JIB's sent to Prize, as well as their reimbursement liabilities for the costs of construction, i.e., the Monthly Capital Commitment paid by NAPCUS. This begins to sound like a lease with Equal Energy as the lessor and the Debtors as the lessee. Lease payments generally have two components. One is the operating expenses incurred by the lessor in making the property available to the lessee for lease. The other is an amount of money designed to provide the lessor with a return on its capital investment in building or creating the leased property. In this instance, the operating

expenses could be considered the former and the Monthly Capital Commitment the latter. In such a lease situation, the lessor retains ownership of the leased property.

47. Again, however, that is not the case here. The CRA further provides that in the event the SWD infrastructure is sold to a third-party, the Debtors will receive 70% of the net proceeds of that sale. It is that provision that finally and clearly indicates a failure of a meeting of the minds by the parties. It is not consistent with the subcontractor analogy discussed above because Equal Energy is retaining an ownership interest in the SWD infrastructure even though it would have been paid in full for its operating expenses and capital improvements. Neither is it consistent with the Debtors' position that the CRA is a disguised secured financing. If the parties' relationship is a loan, the contract should provide that the Debtors own 100% of the SWD infrastructure, which is not the case—Equal Energy gets 30% of the net proceeds. Finally, it is not consistent with the pure lease analogy because the Debtors are receiving an ownership interest in the leased property.

48. In short, the JOA, Farmout Agreement and CRA are hopelessly in conflict with each other. There was simply no meeting of the minds by the parties on their contractual relationship.

49. In such an instance, after four years of exploration drilling and extraction of hydrocarbons and salt water and with operations continuing, the Court must construct an equitable remedy, which is as follows:

a. The Debtors own 100% of the drilling infrastructure.

b. Equal Energy owns 100% of the SWD infrastructure.

c. The Debtors are responsible for both Equal Energy's and the Debtors' pro rata share of the costs associated with drilling (based upon their combined working interest ownership). Other than set forth below, Equal Energy is responsible for the costs associated with the SWD infrastructure and costs of disposal of saltwater in connection with the Debtors' drilling operations.

d. The Debtors and Equal Energy are each responsible for their pro rata share of the operating expenses associated with operating the wells (based upon their individual working interest ownership).

e. The Debtors are not responsible for paying the Capital Recovery Charge and/or Monthly Capital Commitment. Any amounts paid by the Debtors to Equal Energy for the Capital Recovery Charge and/or Monthly Capital Commitment (including interest) are property of the estate and must be returned to the Debtors.[21]

*(b) Per Barrel Costs for Saltwater Disposal and Priority of Equal Energy's Claim for Salt–Water Disposal*

■ 50. Equal Energy seeks in its administrative expense motion $.50 per barrel for disposal of salt-water. In support of this per barrel price is the following evidence: (i) evidence of the rates charged by a selected sampling of "commercial" disposal operators whose operations are unlike the "non-commercial" disposal activities of Equal Energy (Trial Tr. 176:3–177:8; 179:20–180:6), and (ii) references to

---

21. Such return payments shall be made in conjunction with the Court's ruling regarding set off of pre-petition claims. *See infra* ¶ 67.

a fifty-cent rate contained in selected past compulsory pooling orders of the Oklahoma Corporation Commission which now, in recent years, limit the operator to charging for only the "actual costs" of saltwater disposal. Trial Tr. 191:12–25; Trial Tr. 148:24–150:21. The Court does not find this evidence persuasive.

51. For access to the SWD Infrastructure, Equal charges the third-party non-operator working interest owners their proportionate share of the SWD Infrastructure costs and operating expenses. Trial Tr., 113:22–24, 114:11–13.

52. Based on pooling orders, Equal charges $0.50 per barrel for saltwater disposal only to non-operator working interest owners who are not parties to a joint operating agreement or the CRA (to which only Equal and the Debtors are parties) and who do not pay a proportionate share of SWD Infrastructure costs. Trial Tr., 123:4–12.

53. The disposal rates charged by "commercial" disposal operators do not provide a proper basis for setting an appropriate rate for the "non-commercial" disposal activities of Equal Energy because of the differences in commercial disposal operations. More-hazardous chemicals and substances are disposed of at many commercial facilities, which leads to increased fees for such disposal. Trial Tr., 214:19–215:15. Commercial disposal operators are typically subject to greater governmental regulations, which can impact their costs. Trial Tr., 148:6–11. Furthermore, commercial disposal operators are in the business to make a profit on the disposal of saltwater. Trial Tr., 147:15–148:5, 187:1–19.

54. However, the disposal of such produced saltwater is an actual, necessary and essential component of the Debtors' oil and gas production activities at such wells. Indeed, drilling a producing well will not produce hydrocarbons (the endgame in this business) without the SWD Infrastructure to dispose of the produced water. Moreover, Oklahoma law imposes a duty to safely dispose of salt water. See OKLA. STAT. ANN. tit. 52, § 296. ("Salt water shall not be allowed to flow over the surface of the land."). Furthermore, as previously held by the Court, the Court found in the Cash Collateral Order, that "[t]he disposal of salt water generated from post-petition drilling operations occurring at wells in which the [Debtors] have an interest is an actual, necessary, and essential component of drilling activities at such wells." Cash Collateral Order, ¶ 18. Thus, the Debtors are obligated to pay reasonable costs for disposal.

■ 55. Equal Energy, as the Applicant for administrative expense treatment of a Court-approved saltwater disposal rate that Equal Energy seeks to bill to Debtor, bears the burden of proving its entitlement to the recovery sought with its Administrative Claim. *In re Insilco Technologies, Inc.*, 309 B.R. 111, 42 Bankr.Ct. Dec. 258 (Bankr.D.Del.2004). That burden of proof includes showing that the compensation Equal Energy has requested is reasonable and not excessive (since it would not benefit the Debtors' estates to pay unreasonable and excessive fees to Equal Energy). Equal Energy has failed to meet its burden of proof as to the request $.50 per barrel disposal charge.

56. The Court finds that the Banks' witness, Mr. Brittenham, presented a reasonable alternative method of computing a rate of compensation for the Operator that would include a profit component. Mr. Brittenham assumed that the monthly costs of operating the system would continue to be separately paid by Debtor, and then arrived at an opinion as to the reasonable fee that might be charged by an

owner of the SWD Infrastructure in order to recover the costs of construction and a reasonable profit. Trial Tr., 161: 13–162:8. The Court finds that the method so proposed, and the assumptions used by Mr. Brittenham, are reasonable. The middle-range rate reflected by the range of rates described by Mr. Brittenham, and the rate he in fact recommended to the Court if a profit component were to be added to the disposal rate (Trial Tr. 141:2–14), is a rate of 8 cents per barrel of saltwater. The Court concludes that a fee of 8 cents per barrel of saltwater is the appropriate rate to repay capital with a reasonable profit.

57. Based on the evidence presented at trial, including expert reports and testimony, the Court concludes that as compensation for Equal Energy's construction of the SWD infrastructure, which has a tangible benefit to the Debtors' estates, the Debtors must pay Equal Energy a charge of $.08 per barrel for all saltwater disposed of by Equal Energy in connection with the Debtors' drilling operations from the inception of drilling going forward.

### i. Priority For Pre and Post Petition Salt–Water Disposal

58. Equal Energy seeks the allowance of its administrative expense claim pursuant to sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code because of Plaintiffs' continued post-petition use of Equal Energy's SWD Infrastructure. To qualify as an administrative expense, which enables priority treatment under section 507 of the Bankruptcy Code, an expense must satisfy the requirements of section 503(b) of the Bankruptcy Code. Section 503(b) of the Bankruptcy Code provides in pertinent part:

> After notice and a hearing, there shall be allowed administrative expenses ... including—

(1)(A) the actual, necessary costs and expenses of preserving the estate.

11 U.S.C. § 503(b)(1)(A). While both sections 503(b) and 503(b)(1)(A) specifically enumerate various expenses entitled to administrative priority, these lists are non-exhaustive. 4 Lawrence P. King, Collier on Bankruptcy ¶ 503.05[1], at 503–23, (rev. 15th ed. 2006) (explaining the term "including" is not a limitation and "[t]he court may determine that additional types of claims are expenses that should be accorded administrative priority in a particular case.").

59. A claimant asserting an administrative expense bears the burden to demonstrate that the expense, "(i) arose out of a postpetition transaction with the debtor in possession, and (ii) directly and substantially benefits the estate." *In re Mid–Am. Waste Sys., Inc.,* 228 B.R. 816, 821 (Bankr.D.Del.1999); *see also Calpine Corp., v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.),* 181 F.3d 527, 532–33 (3d Cir.1999).

60. In the context of executory contracts, a non-debtor party to an executory contract is entitled to administrative expenses equal to the value of any postpetition benefit conferred on the estate prior to assumption or rejection of that contract. *See, e.g., NLRB v. Bildisco & Bildisco,* 465 U.S. 513, 531, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984); *In re BCE W., L.P.,* 264 B.R. 578, 584 (9th Cir. BAP 2001).

61. Administrative expenses are awarded to encourage parties to continue to do business with a debtor post-petition. *See In re Economy Lodging Sys., Inc.,* 234 B.R. 691 (6th Cir. BAP 1999); *see also Toma Steel Supply Inc. v. TransAmerican Natural Gas Corp. (In re TransAmerican Natural Gas Corp.),* 978 F.2d 1409, 1420 (5th Cir.1992) (stating that

"the purpose of the priority treatment afforded by § 503 is to encourage third parties to provide necessary goods and services to the debtor-in-possession so that it can continue to conduct its business, thus generating funds from which prepetition creditors can be paid"). In addition, the amount of an administrative expense claim will generally be calculated pursuant the parties' underlying contract or agreement. *See In re Williams Contract Furniture, Inc.*, 148 B.R. 799, 804 (Bankr.W.D.Va. 1992). In this regard, the negotiated terms of the parties will be presumed to be the proper basis for the calculation of the administrative expense claim.

62. As the pre-petition access to the SWD Infrastructure did not arise out of a postpetition transaction with the debtor in possession nor did it directly and substantially benefits the Debtors' estates,[22] Equal Energy has a general unsecured claim against the Debtors' estates for $.08 per barrel charge from the inception of the drilling through the day before the Petition Date.[23]

▆ 63. As Equal Energy provided a tangible benefit to the Debtors' estate by providing post-petition access to the SWD Infrastructure without which the Debtors could not drill and produce hydrocarbons. For the period from the Petition Date going forward, Equal Energy has an administrative expense claim against the Debtors' estates for the $.08 per barrel charge.

### ii. Operating Expenses and Priority Thereof

64. Equal Energy and the Debtors are each responsible for their own pro rata share of the operating expenses incurred by Equal Energy in connection with disposing of saltwater produced from the Debtors' drilling operations from the inception of drilling going forward.

▆ 65. As the pre-petition operating expenses of the SWD Infrastructure did not arise out of a postpetition transaction with the debtor in possession nor did it directly and substantially benefits the Debtors' estates,[24] Equal Energy has a general unsecured claim against the Debtors' estates for the unpaid saltwater disposal operating expenses from the inception of the drilling through the day before the Petition Date.

66. As the SWD Infrastructure provided a tangible benefit to the Debtors' es-

---

**22.** *In re Mid–Am. Waste Sys., Inc.*, 228 B.R. 816, 821 (Bankr.D.Del.1999); *see also Calpine Corp., v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 532–33 (3d Cir.1999).

**23.** On December 20, 2010, the Court requested the parties supply additional information (divided on a pre and postpetition basis) concerning the amount billed and paid under the CRA; the number of barrels of salt-water disposed of on behalf of NAPCUS; and the amount billed to and paid for by NAPCUS for operating expenses. With this information the Court hoped to calculate Equal Energy's general unsecured claim and administrative claim and any set-off allowed. Although NAPCUS and the Banks provided the Court with identical information, the information

provided by Equal Energy was vastly different. As such evidence was not provided at trial, the Court requests that the parties attempt to resolve these differences and submit a proposed order consistent with the rulings set forth herein (including any calculation of such claims). If the parties are unable to reach an agreement, the Court requests that the parties submit certificates of counsel attaching any documentation regarding the requested information and a (competing) proposed order within 10 days of the date of these Findings.

**24.** *In re Mid–Am. Waste Sys., Inc.*, 228 B.R. 816, 821 (Bankr.D.Del.1999); *see also Calpine Corp., v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 532–33 (3d Cir.1999).

tate, for the period from the Petition Date going forward, Equal Energy has an administrative expense claim against the Debtors' estates for those charges (the Court understands that pursuant to a previous order, the Debtors' are currently paying these expenses on a post-petition basis).

### iii. Set-off

67. Any prepetition assets/claims shall be set off. The same is applicable for any post-petition assets/claims.

### iv. Additional Rulings of the Court

68. Absent further order of the Court, the Debtors are required to continue with ordinary course drilling operations and to pay all charges incurred post-petition for both the $.08 per barrel fee and their pro rata share of saltwater disposal operating expenses within 30 days of receipt of invoice.

69. Absent further order of the Court, Equal Energy is required to continue with its saltwater disposal operations in connection with the Debtors' drilling operations.

70. To the extent not terminated by the parties' settlement (*see* D.I. 610 and 643), all other provisions of the JOA and Farmout Agreement that are not inconsistent with these rulings remain in place. Furthermore, the CRA is void in its entirety.

### *CONCLUSION*

For the foregoing reasons, upon issuance of the Court's Final Findings of Fact and Conclusions of Law and an order implementing the same, the Court will: (i) find, in part, in favor of the Debtors and the Bank under Count 1 of the Complaint; (ii) find in favor of Equal Energy under Counts 2 and 7 of the Complaint; and (iii) find, in part, in favor of Equal Energy on its Administrative Claim.

The Debtors are directed to consult with the Banks and Equal Energy and to submit an appropriate order under certification of counsel.